IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JESUS HERNANDEZ, et al., individually** | : | |
| **and on behalf of all others similarly situated,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | |
| **ASHLEY FURNITURE INDUSTRIES, INC.,** | : | |
| **et al.,** | : | **No. 10-5459** |
| **Defendants.** | : | |

## MEMORANDUM

Schiller, J.                                                                                      May 22, 2013

     Jesus Hernandez, Raquel Marte, and Steven Wambold bring this putative class action against their former employer, Ashley Furniture Industries, Inc. ("Ashley"). Plaintiffs allege violations of the Pennsylvania Minimum Wage Act ("MWA") and the Pennsylvania Wage Payment and Collection Law ("WPCL"), as well as breach of contract and unjust enrichment claims. Currently before the Court is Plaintiffs' renewed motion for class certification. For the following reasons, the Court will put the certification issue to bed and deny Plaintiffs' motion.

## I.     BACKGROUND

     Ashley is a furniture manufacturer, retailer, and distributor headquartered in Wisconsin. (Def.'s Mem. of Law in Opp'n to Pls.' Renewed Mot. for Class Certification [Def.'s Resp.] Ex. A [Dotta Decl.] ¶ 3.) Ashley's Leesport, Pennsylvania facility, from where this litigation arises, includes a furniture assembly operation and a warehouse, which have separate organizational and reporting structures. (*Id.* ¶¶ 3-4.)

     Plaintiffs claim that Defendant violated Pennsylvania law by forcing employees to work, or failing to pay employees for all time worked, before and after scheduled shifts, during paid rest

breaks, and during unpaid meal breaks. Plaintiffs also argue that assembly employees are not

properly compensated under Ashley's incentive pay system. The proposed class includes:

> All current and former non-supervisory hourly employees of Ashley Furniture Industries, Inc. at the company's Leesport, Pennsylvania facility who worked at any time during the period of September 16, 2007 to the date of entry of judgment in this case for Counts I and II of the Complaint, and the period of September 16, 2006 to the date of entry of judgment in this case for Counts III and IV of the Complaint.

(Pls.' Proposed Order.) Of the 5,700 members in the proposed class, approximately 75% are current

or former assembly employees and 25% are current or former warehouse employees. (Pls.' Mem.

of Law in Supp. of Renewed Mot. for Class Certification [Pls.' Mot.] at 2.) All of the Named

Plaintiffs are former assembly employees. (*See* Pls.' Mot. Ex. 27 [Wambold Dep.]; Def.'s Resp. Ex.

P [Hernandez Dep.]; *id.* Ex. Q [Marte Dep.].) Some class members received incentive-based pay,

while others received hourly pay. (*See* Wambold Dep. at 24 (discussing his incentive pay); Marte

Dep. at 21 (discussing her hourly pay).)

## A.     Ashley's Electronic Timekeeping System

Ashley uses an electronic timekeeping system to track its employees' hours. (Def.'s Resp.

Ex. D [Long Decl.] ¶ 5.) Employees are expected to clock in at the beginning of their work day and

clock out at the end. (*Id.* ¶¶ 8, 21-22.) Ashley's official policy is that employees should clock in no

earlier than fifteen minutes before the scheduled start time for their shift. (Def.'s Resp. Ex. W

[Ashley Policy Manual] at 9.) Ashley's payroll records show the actual time the employee clocked

in as well as the time the employee's shift began. (Long Decl. ¶ 7.) For incentive-paid assembly

workers, the records also show the time when the supervisor scanned the first production order into

the system, signaling the start of production. (*Id.*)

If an employee clocks in during the fifteen-minute window prior to her scheduled start time,

2

the system is programmed to disregard the employee's clock-in time and calculate pay from the scheduled start time unless the supervisor enters additional time. (Long Decl. ¶ 8.) If work begins before the scheduled start time, a supervisor is responsible for adjusting the time records to reflect the actual hours worked by each employee. (*Id.*) Ashley's payroll records do not indicate what employees do between their clock-in time and the start of their shift. (*Id.* ¶ 16.) Under Ashley's policy, the time between clock-in and shift start is the employee's personal time during which they are free to go to a break room, cafeteria, or outside. (*Id.*)

Ashley gives employees a thirty-minute unpaid meal break every day. (*Id.* ¶ 19; Ashley Policy Manual at 3.) The electronic timekeeping system is programmed to deduct this break from an employee's pay. (Long Decl. ¶ 19.) Lights in the assembly area and power for the tools are turned off during meals so that production cannot take place. (Def.'s Resp. Ex. G [Wade Dep.] at 88-89.) If, however, an employee is asked to work during the meal break, a supervisor can override the system's default to ensure that the employee is paid for the additional time. (Long Decl. ¶ 19.) Ashley's payroll records show a number of instances in which supervisors overrode the default for unpaid meal breaks. (*See id.* ¶ 20.) Ashley also gives employees at least one ten-minute paid rest break every shift. (Ashley Policy Manual at 3; *see also* Def.'s Resp. Ex. L [Lepore Decl.] ¶ 20; Def.'s Resp. Ex. L [Hikes Decl.] ¶¶ 11-16 (describing two ten-minute breaks for employees).) Because employees do not clock out for rest breaks, Ashley's records do not show whether the breaks were actually taken. (Long Decl. ¶¶ 17-18.)

Incentive-paid employees are expected to clock out within eleven minutes after their supervisor has closed production for the day. (*Id.* ¶ 21.) The end time is rounded to the time the line was shut down unless a supervisor overrides this default setting. (*Id.*) Similarly, hourly-paid

employees have eleven minutes after their scheduled shift ends to clock out, and their pay is rounded by default to the scheduled shift end time unless no end time is programmed or the employee clocks out more than eleven minutes after the end of shift, in which case the employee is paid until the time she clocked out.  (*Id.* ¶ 22.) It is up to each individual supervisor to ensure that employees are paid for any work performed after the shift ends. (*See id.* ¶¶ 21, 27.)

**B.    Ashley's Incentive Pay System**

Some of Ashley's assembly employees receive an hourly wage that is adjusted according to how efficiently they work. (Def.'s Resp. Ex. F [Muller Dep.] at 23; Long Decl. ¶ 28.) This incentive pay system is explained to new employees during their orientation. (Long Decl. ¶ 28; *see also* Def.'s Resp. Ex. K [Incentive Pay PowerPoint].) Warehouse employees do not receive incentive pay. (Long Decl. ¶ 42.)

Under the incentive pay system, each worker has two assigned wage rates: (1) a "low base rate" of approximately $8 per hour, providing minimum compensation regardless of productivity, and (2) a "high base rate" of approximately $12 per hour for greater efficiency as measured against Ashley's engineering standards. (Long Decl. ¶ 31; *see also* Def.'s Resp. Ex. H [Colon Dep.] at 46; Def.'s Resp. Ex. E [Koslo Dep.] at 51-52; Incentive Pay PowerPoint.) Employees whose production line assembles furniture at a rate equal to the engineering standard on a given day receive the high base rate per hour of production work performed that day. (*See* Incentive Pay PowerPoint.) If, for example, the line produces at 110% of the engineering standard, employees will receive 110% of the high base rate. (*See id.*) If, however, the line produces at only 90% of the engineering standard, employees will receive 90% of the high base rate. (*See id.*) Regardless of productivity, employees should never receive less than the low base rate for each hour worked. (*See* Long Decl. ¶ 36 ("Ashley

4

will look at the entire work day to be sure that each employee receives his minimum guaranteed hourly low base rate for all hours worked during the day regardless of the efficiency of the line.").)

Line supervisors, like warehouse employees, earn a straight hourly wage and do not receive incentive pay. (*See* Colon Dep. at 64; Wade Dep. at 29-30; Long Decl. ¶ 42.) They are responsible for putting the line into "downtime," during which employees are paid their low base rate and their incentive rate is not affected, when production stops for reasons beyond the incentive-paid employees' control. (Long Decl. ¶ 31; Wade Dep. at 58-61, 63-64.) In addition, Ashley's engineering standards accounted for brief periods of delay, such as the scheduled ten-minute breaks all employees take or restroom breaks. (*Id.*; Koslo Dep. at 74-75.) While employees do not receive incentive pay for a partially assembled order, they ultimately receive incentive pay when work is completed on the order the next day. (Long Decl. ¶ 36.)

### C.    Named Plaintiffs

#### 1.    *Jesus Hernandez*

Hernandez was an assembly worker at Ashley's Leesport facility for approximately three weeks in 2010. (Hernandez Dep. at 14, 18; Pls.' Mot. Ex. 28 [Named Pls.' Time Records] at 1.) He was hired as an incentive-paid employee but was told he would initially receive an hourly wage of $10.30 during his training period, which had no specific end date. (Hernandez Dep. at 12, 16-17.) Hernandez walked off the job after an altercation with his supervisor. (*Id.* at 19-21.) During his short time at Ashley, Hernandez never received incentive pay. (*Id.* at 18.)

Though Hernandez's shift started at 7:00 a.m., the plant manager told him to arrive at 6:45 a.m. (*Id.* at 21-22.) Hernandez did this for only one or two days, however, because other employees told him not to and there was "no sense coming in early." (*Id.* at 22-23.) After that, Hernandez

usually arrived between five and ten minutes before the start of his shift, clocked in, and went to his work station. (*Id.* at 23-24.) Hernandez testified that, in his experience, fellow employees generally arrived five to ten minutes before their shift, but that it varied for each Ashley employee. (*Id.* at 23.)

The production line Hernandez worked on shut down every day during the thirty-minute meal break. (*Id.* at 40.) Hernandez sometimes came back early from his meal break to get his tools so that he would be ready to begin work when the bell rang. (*Id.* at 41.) He testified that his team members did the same. (*Id.*) While Hernandez generally took both morning and afternoon rest breaks, he testified that other employees sometimes worked through the rest breaks because they wanted to keep their incentive pay high. (*Id.* at 42.)

In the three weeks Hernandez worked for Ashley, time records indicate that he was paid for time worked before his scheduled shift start time on numerous occasions. (Named Pls.' Time Records at 1.) He was also paid until his actual clock-out time on most days. (*Id.*) Hernandez never worked after clocking-out. (Hernandez Dep. at 39.) According to Hernandez, his claims only involve allegations that he was not paid when he worked before his scheduled shift time, and do not stem from work during break times or working after clock-out. (*Id.* at 39-40.)

### 2.   *Raquel Marte*

Marte was a quality control inspector at Ashley's Leesport facility from February 2008 to May 2010. (Marte Dep. at 19-21, 57; Named Pls.' Time Records at 1-15.) She was paid an hourly wage and did not participate in the incentive pay system. (Marte Dep. at 21.) Marte was told she could clock in up to fifteen minutes before the start of her shift. (*Id.* at 44.) If she arrived early, she would go to the cafeteria to get a cup of coffee, then get her tools and go to the line. (*Id.*) The production line Marte worked on shut down every day during the thirty-minute meal break. (*Id.* at

50-52.) She sometimes worked through rest breaks. (*Id.* at 53-54.) Marte claims her shift supervisor often clocked her out before her work day had ended, which the supervisor denies. (*Id.* at 67-70; Def.'s Resp. Ex. I [Wolf Decl.] ¶ 28.)

From the start of Marte's employment until June 8, 2009, Ashley's time records show that, on sixty-seven occasions, Marte was paid for time worked before her scheduled shift start time. (Named Pls.' Time Records at 1-10.) These could represent either (1) times when Marte's supervisor overrode the system default to ensure that she was paid for additional time worked, or (2) times when no shift start time was programmed into the system, which would result in payment from Marte's clock-in time. (*See* Long Decl. ¶ 10.) Starting on June 9, 2009, when Marte's start time changed, Marte was paid beginning at her actual clock-in time every day. (Named Pls.' Time Records at 10-15; *see also* Marte Dep. at 55-57.) Marte was paid until her actual clock-out time on most days. (Named Pls.' Time Records at 1-15.)

<blockquote>3.   <em>Steven Wambold</em></blockquote>

Wambold was an incentive-paid assembly worker at Ashley's Leesport facility from August 2009 to April 2010. (*See* Wambold Dep. at 24; Named Pls.' Time Records at 15-19.) His shift generally began at 6:00 a.m., and if he arrived early he would clock in and gather his tools and materials to be ready at the start of the shift. (Wambold Dep. at 64-65.) Sometimes, he prepared the production line before his shift start, and sometimes other team members arrived early to prepare it. (*See id.*) Wambold worked during meal breaks three or four days a week, sometimes with other employees on the line, in an effort to improve efficiency. (*Id.* at 56, 150-51.) He also worked through his morning break about two days a week and his afternoon break three to four days a week. (*Id.* at 56-58, 151-52.) In addition, he performed tasks such as cleaning and packing up after the line was

shut down for the day but before he had clocked out. (*Id.* at 153.)

Ashley's time records show that in the eight months Wambold worked for the company, he was paid for time worked before his scheduled shift start time on twenty-three occasions. (Named Pls.' Time Records at 15-19.) Wambold was also paid until his actual clock-out time on many days. (*Id.*)

### D.    Additional Discovery

In support of their renewed motion for class certification, Plaintiffs attached declarations from twenty-one members of the proposed class. (*See* Pls.' Mot. Exs. 3-23.) In those declarations, many former employees stated that they performed work after clocking in but before their scheduled start time and were not paid for this work. (*See, e.g.*, Pls.' Mot. Ex. 6 [R. Castillo Decl.] ¶¶ 13-14; Pls.' Mot. Ex. 10 [Guerrero Decl.] ¶¶ 13-15; Pls.' Mot. Ex. 13 [Moses Decl.] ¶¶ 13-14; Pls.' Mot. Ex. 23 [Whyte Decl.] ¶¶ 13-14.) The depositions reveal a variety of practices, however. Former employee Rafael Castillo stated that he sometimes arrived and began working early, but this differed depending on the line he was working. (Def.'s Resp. Ex. X [R. Castillo Dep.] at 75-77.) Former employee Mary Moses would sometimes start early, if her supervisor requested, but her supervisor only made such requests sporadically. (Def.'s Resp. Ex. X [Moses Dep.] at 56-57.) Former employee Demaris Guerrero testified that when she arrived early, she would wait in her car and did not clock in until two to three minutes before her shift start time. (Def.'s Resp. Ex. X [Guerrero Dep.] at 87-88.)

Additionally, several former employees declared that they regularly worked through all or part of their unpaid meal breaks and paid rest breaks and were not compensated for that time. (*See, e.g.*, Pls.' Mot. Ex. 11 [G. Hernandez Decl.] ¶¶ 15-21; Whyte Decl. ¶¶17-23; Pls.' Mot. Ex. 8 [Y.

Marte Decl.] ¶¶ 19-26.) Once again, the deposition testimony indicates that employees' experiences were far from uniform. Former employee Yonairy Concepcion Marte testified that she took her meal break every day and was never asked to work during that time. (Def.'s Resp. Ex. X [Y. Marte Dep.] at 54-57.) She stated that some assembly workers would return from lunch early and begin working, but it differed for each person, explaining that "[s]ome of them [came back from lunch] at 12:30, some of them a couple minutes before others, some of them a lot of minutes before that." (*See id.* at 58.) Former employee Geovany Hernandez testified that he and his coworkers always took their rest breaks. (Def.'s Resp. Ex. X [G. Hernandez Dep.] at 77-78.) Whyte testified that he sometimes worked through his morning rest break but frequently took his afternoon break, and that some of his coworkers took their breaks while others did not. (Def.'s Resp. Ex. X [Whyte Dep.] at 50-53.) Manuel Bravo stated that he and another employee occasionally spent a portion of their lunch break working, but that it depended on whether he was behind in the production, and that the other employees on his line took their lunches. (Def.'s Ex. X [Bravo Dep.] at 36-38.)

Finally, some former employees declared that they worked on tasks such as cleaning and setting up for the next day after their line was shut down. (*See, e.g.*, Pls.' Mot. Ex. 3 [Alicea Decl.] ¶¶ 28-30; Pls. Mot. Ex. 4 [Bravo Decl.] ¶¶ 28-29; R. Castillo Decl. ¶¶ 32-33.) Employee depositions revealed variations in clock-out procedures. For example, Whyte testified that he did not work after badging out, and that the time he badged out would "vary significantly" depending on his workload. (Whyte Dep. at 84-85.) Yanelbis Castillo testified that she was never asked to work after she had clocked out. (Def.'s Resp. Ex. X [Y. Castillo Dep.] at 120.) Rafael Castillo stated that he spent thirty to forty-five minutes setting up the line for the next shift, after his shift had ended, but that he clocked out accordingly and was never asked to clock out and then return to work. (R. Castillo Dep.

9

at 126-29.)

Ashley has provided testimony from several supervisors and managers who deny Plaintiffs' claims that they permitted or required unpaid work on their lines. (*See, e.g.*, Wolf Decl.; Def.'s Resp. Ex. L [Supervisor/Manager Decls.].)

### E.    Plaintiffs' Expert Report

On August 9, 2012, the Court denied Plaintiffs' first motion for class certification without prejudice, providing the parties with additional time to retain experts in support of their positions on class certification. Plaintiffs' expert, Dr. David L. Crawford, frames various methods for estimating class-wide damages, the use of which will depend on a factfinder's determinations on liability. (*See, e.g.*, Pls.' Mot. Ex.1 [Pl. Expert Report] ¶¶ 21-24.) For example, Plaintiffs' expert explains that "if the finder of fact determines that all or some group of class members were required or permitted to skip or return early from paid rest breaks but were not compensated," then based on testimony the finder of fact will determine "the typical amount of time [of uncompensated work] for the average employee," and the expert will finally convert those findings to a calculation of damages. (*Id.* ¶ 24.)

## II.    STANDARD OF REVIEW

"In deciding whether to certify a class under Fed. R. Civ. P. 23, the district court must make whatever factual and legal inquiries are necessary and must consider all relevant evidence and arguments presented by the parties." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). The plaintiffs must make more than a "threshold showing" that the requirements of Rule 23 are satisfied. *Id.* Thus, when there is "overlap between a class certification requirement and the

merits of a claim," the court should not hesitate to resolve factual disputes relevant to determining whether a class certification requirement is met. *Id.* at 316; *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011). Such findings of fact must be made by a preponderance of the evidence. *Hydrogen Peroxide*, 552 F.3d at 320. "It may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, and . . . certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Comcast*, 133 S. Ct. at 1432.

## III.   DISCUSSION

A party seeking class certification must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). These prerequisites are known as numerosity, commonality, typicality, and adequacy. *See Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013). The proposed class must also satisfy at least one of the three requirements set forth in Rule 23(b). *Dukes*, 131 S. Ct. at 2548. Here, Plaintiffs rely on Rule 23(b)(3), which applies when: (1) questions of law or fact common to class members predominate over any questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. These requirements are referred to as predominance and superiority. *See id.* at 2558-59.

Defendant contends that Plaintiffs fail to satisfy the commonality requirement of Rule

23(a)(2) and the predominance requirement of Rule 23(b)(3). Because the Court agrees that Plaintiffs cannot meet the predominance requirement of Rule 23(b)(3) for any of their claims, it need not address the other requirements of Rule 23, as "[f]ailure to meet any of Rule 23(a) or 23(b)'s requirements precludes certification." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 147 (3d Cir. 2008).

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation, a standard far more demanding than the commonality requirement of Rule 23(a)." *Hydrogen Peroxide*, 552 F.3d at 311 (internal quotation marks omitted). "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 172 (3d Cir. 2001). While plaintiffs are not required to prove the elements of their claims at the class certification stage, the court must consider these elements "through the prism of the predominance requirement to determine whether they are capable of proof with common, class-wide evidence." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 600 (3d Cir. 2012). This calls for the court to make a "rigorous assessment of the available evidence." *Hydrogen Peroxide*, 552 F.3d at 312.

### A.    Statutory Claims

Plaintiffs' central claims are that Defendant failed to pay members of the proposed class for all hours worked, in violation of the MWA and WPCL. (Am. Class Action Compl. ¶¶ 70-81.) The MWA sets a minimum wage and mandates that employees receive at least one-and-a-half times their regular wage for overtime work. *See* 43 Pa. Cons. Stat. §§ 333.104, 333.113. The WPCL permits employees to recover unpaid wages, including "fringe benefits or wage supplements," owed by an employer.  *See* 43 Pa. Cons. Stat. §§ 260.3, 260.9a; *see also Doe v. Kohn, Nast & Graf, P.C.*, 862

12

F. Supp. 1310, 1325 (E.D. Pa. 1994) ("The WPCL does not create a statutory right to compensation. Rather, it provides a statutory remedy when the employer breaches a contractual right to earned wages."). Specifically, Plaintiffs allege that members of the proposed class were not paid for all time worked before and after scheduled shifts, during paid rest breaks, and during unpaid meal breaks. They also allege that incentive-paid employees were not put into downtime when appropriate. Based on the available evidence, the Court finds that resolving these claims would necessitate an individualized inquiry for each claimant, making the claims unsuitable for class certification.

Plaintiffs argue that they can prove on a class-wide basis that the rounding of start and end times under Ashley's electronic timekeeping system denies employees pay for all hours worked. However, Ashley vests each supervisor with the authority to override the default settings if an employee works before or after scheduled shift times. Plaintiffs have not demonstrated that Ashley's supervisors uniformly exercised this discretion in a manner that permitted employees to work without pay. To the contrary, the testimony of Named Plaintiffs and other former employees reflects a broad range of experiences, and Ashley's time records show many instances in which employees were paid from the time they clocked in until the time they clocked out. Thus, Plaintiffs' assertion that the claims may be adequately determined by "representative testimony," then applied to all class members based on their punch clock records, is inaccurate. There is no way to determine, without resorting to individualized inquiry, whether an employee whose start or end time was rounded on a particular day actually worked additional time without compensation. *See, e.g.*, *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1191-92 (11th Cir. 2009) (finding punch clock records did not provide common proof of uncompensated work before or after scheduled shifts when employees engaged in a variety of work and non-work activities during those times); *Masterson v. Fed. Express*

13

*Corp.*, 269 F.R.D. 439, 444 (M.D. Pa. 2010) (same).

Similarly, the evidence does not support Plaintiffs' contention that Ashley has a consistent practice of permitting or requiring employees to work through paid rest breaks or unpaid meal breaks without compensation. Again, supervisors may override the electronic timekeeping system's automatic deduction for meal breaks, and Ashley's records indicate numerous times they did so. In addition, numerous former employees, including Named Plaintiffs, testified that they did not work during meal breaks or rest breaks. Thus, ascertaining whether a statutory violation occurred would require individual inquiry for each employee. *See, e.g.*, *Ordonez v. Radio Shack, Inc.*, Civ. A. No. 10-7060, 2013 WL 210223, at *11 (C.D. Cal. Jan. 17, 2013) (ruling no predominance when there was conflicting testimony about whether employees received rest breaks); *Burkhart-Deal v. Citifinancial, Inc.*, Civ. A. No. 08-1289, 2010 WL 457122, at *4 (W.D. Pa. Feb. 4, 2010) (refusing to certify class involving MWA and WPCL claims when "[d]etails of the departures from the 'formal' policy, rather than presenting an unvarying and consistent pattern, differ in significant ways"); *In re Wal-Mart Wage & Hour Emp. Practices Litig.*, Civ. A. No. 06-225, 2008 WL 3179315, at *19 (D. Nev. June 20, 2008) (finding statistical analysis of time records not sufficient to explain why employees missed breaks).

Finally, Plaintiffs' allegations that incentive-paid employees were not put into downtime when appropriate would also require individualized proof to determine factual issues such as when production stopped, how long it remained stopped, and whether downtime was appropriate in a particular instance.

### B.    Unjust Enrichment Claim

In addition to their MWA and WPCL claims, Plaintiffs have also brought an unjust

enrichment claim. To make out a claim for unjust enrichment under Pennsylvania law, Plaintiffs must demonstrate: (1) benefits conferred on Defendant by each member of the proposed class; (2) appreciation of such benefits by Defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for Defendant to retain the benefits without payment of value. *See Stoeckinger v. Presidential Fin. Corp. of Del. Valley*, 948 A.2d 828, 833 (Pa. Super. Ct. 2008). "Whether the doctrine applies depends on the unique factual circumstances of each case." *Id.* Thus, "the unjust enrichment claim essentially *demands* an individualized inquiry, because it requires a showing that the plaintiff performed services in good faith, that the defendant accepted those services, and that the plaintiff had a reasonable expectation of compensation." *Masterson*, 269 F.R.D. at 444 (declining to certify unjust enrichment claim). As set forth above, the question of whether Ashley failed to pay for all hours worked—in other words, whether a benefit was conferred upon Defendant and under what circumstances—would require individualized inquiry for each member of the proposed class. *See, e.g.*, *Wal-Mart*, 2008 WL 3179315, at *19 ("With respect to unjust enrichment, . . . without individual inquiry, it would not be known from the records alone whether the employee worked unpaid time. Further, a jury could not determine whether Wal-Mart accepted or knew of the benefit and unjustly retained it without inquiring into whether the employee actually worked uncompensated time."); *see also Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) ("[B]efore it can grant relief on [unjust enrichment claims], a court must examine the particular circumstances of an individual case and assure itself that, without a remedy, inequity would result or persist. Due to the necessity of this inquiry . . . courts, including ours, have found unjust enrichment inappropriate for class action treatment.").

C.     **Breach of Contract Claim**

Finally, Plaintiffs bring a breach of contract claim. To establish a breach of contract claim under Pennsylvania law, Plaintiffs must prove: "(1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages." *See Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 716 (Pa. Super. Ct. 2005). This would also demand individualized inquiry into the existence of a breach and damages for each member of the proposed class. *See, e.g.*, *Wal-Mart*, 2008 WL 3179315, at *19 ("Plaintiffs' breach of contract claims would involve particularized inquiry into contract formation, including such issues as meeting of the minds, breach, and damages."); *see also Folks v. State Farm Mut. Auto. Ins. Co.*, 281 F.R.D. 608, 620 (D. Colo. 2012) (denying certification of class action involving breach of contract claims when calculating damages may have required individualized analysis); *De Giovanni v. Jani-King Int'l, Inc.*, 262 F.R.D. 71, 77 (D. Mass. 2009) (refusing to certify class action breach of contract claims when "Plaintiffs have not put forward any common form of proof that would permit this Court to make such a determination [that a breach occurred] without engaging in lengthy, individualized inquiries regarding breach."); *Basco v. Wal-Mart Stores, Inc.*, 216 F.Supp.2d 592, 602-03 (E.D. La. 2002) (refusing to certify breach of contract claims when "damages suffered by each defendant will vary").

IV.     **CONCLUSION**

As Plaintiffs have not met the predominance requirement of Rule 23(b)(3), the Court denies their motion for class certification. An Order consistent with this Memorandum will be docketed separately.